UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

|  |  |  |
|---|---|---|
| DENICE JOHNSON, | * | |
| | * | |
| Plaintiff, | * | |
| | * | |
| v. | * | |
| | * | |
| | * | Civil Action No. 23-cv-10906-ADB |
| THE CITY OF BROCKTON and OFFICER | * | |
| RAYMOND PARRETT, | * | |
| | * | |
| Defendants. | * | |
| | * | |
| | * | |
| | * | |

**MEMORANDUM AND ORDER**

BURROUGHS, D.J.

Plaintiff Denice Johnson ("Johnson") brings this action against the City of Brockton ("Brockton") and Officer Raymond Parrett ("Parrett") (collectively, "Defendants"), related to Parrett and other Brockton police officers' conduct towards her while she was recording Parrett's questioning of her schoolmate on October 3, 2019. [ECF No. 1 ("Complaint" or "Compl.")]. Before the Court is Brockton's motion to dismiss. [ECF No. 11]. For the reasons set forth below, the motion is GRANTED.

I. BACKGROUND

A. Factual Background

The following facts are taken from the Complaint, the factual allegations of which are

1

assumed to be true when considering a motion to dismiss. Ruivo v. Wells Fargo Bank, N.A., 766 F.3d 87, 90 (1st Cir. 2014).

On October 3, 2019, Johnson and her friend, Roberto Emile, both seventeen years old at the time, were walking home from Brockton High School when they came upon multiple other juveniles disrupting the flow of traffic on Forest Street near the school. [Compl. ¶¶ 7–8, 10–11]. The Brockton Police Department ("BPD") had dispatched five to seven officers in response to the disruption, including Parrett and a supervising police lieutenant. [Id. ¶¶ 8-9].

To avoid the disruption on Forest Street, Johnson and Emile turned onto Florence Street, which was less crowded. [Compl. ¶¶ 11–12]. There, Johnson and Emile saw Parrett driving towards them in a police cruiser. [Id. ¶ 13]. Emile stated, "f[***] the police" loud enough for Parrett to hear. [Id. ¶¶ 15–16]. Parrett stopped his police cruiser, approached Emile and Johnson, getting within arm's length of them, and demanded that Emile repeat what he had said. [Id. ¶¶ 18–21]. Parrett repeated his demand several more times and got closer to Emile, eventually drawing chest to chest with him, while Emile was attempting to walk away with his hands up. [Id. ¶¶ 22–23].

At this time, Johnson took her phone out and began recording Parrett's interaction with Emile. [Compl. ¶ 24]. The Complaint is not entirely clear as to how many officers were present during Emile and Johnson's interaction with Parrett, but viewing the Complaint in the light most favorable to Johnson, the Court infers that multiple officers, including a supervising officer, were present. Parrett became angry with Johnson and ordered her, using expletives, to stop recording. [Id. ¶ 26; id. ¶ 31 ("Defendant Parrett commanded to Ms. Johnson to get that phone out of [h]is 'f[***]ing face' and ordered her to stop 'f[***]ing' recording him")]. Parrett also slapped Johnson's phone out of her hands at least three times. [Id. ¶¶ 27–33]. Each time, Johnson

picked up her phone and continued to record the interaction. [Id.]. After Parrett slapped Johnson's phone out of her hands for a third time, he and other BPD officers arrested two other individuals close by. [Id. ¶¶ 33–34]. Johnson complied with officers' requests to move aside while these individuals were being arrested. [Id. ¶ 34]. Johnson and Emile then began to walk away, but an officer stated "you want to talk sh[**]. You're under arrest[,]" grabbed Emile, and slammed him to the ground. [Id. ¶¶ 35–36]. Emile repeatedly asked what he had done to warrant arrest. [Id. ¶ 37]. In response, the officer tased Emile, handcuffed him, and put him in a police cruiser. [Id. ¶ 37–38].

Parrett then pointed to Johnson and grabbed her hand. [Compl. ¶¶ 39, 42]. Johnson, who was still recording the officers' conduct, asked permission to put her phone in her pocket. [Id. ¶¶ 39–42]. Parrett refused Johnson's request, grabbed her by the hair, and threw her to the ground. [Id. ¶ 42]. Once on the ground, Johnson told Parrett at least twice that she intended to listen to him but wanted to put her phone away. [Id. ¶¶ 43–44]. Johnson also told Parrett that she was hurt. [Id. ¶ 43]. Parrett then flipped Johnson around onto her back and pepper sprayed her for three seconds. [Id. ¶¶ 45–46]. Johnson was handcuffed and brought to the police station. See [Id. ¶¶ 48–53]. Despite asking for medical attention several times, care was not arranged or provided. [Id. ¶ 50].

BPD internal affairs conducted a review of the officers' conduct related to the October 3, 2019 incident and concluded that, based on Parrett's and other officers' reports and a video of the incident, the officers involved, including Parrett, "acted appropriately and followed department rules and regulations." [Compl. ¶ 55].

    **B.**      **Procedural History**

Johnson filed her Complaint on April 30, 2023, asserting an excessive force claim against Parrett, alleging violations of the Fourth, Eighth, and Fourteenth Amendment (Count I); a First Amendment retaliation claim against Parrett (Count II); a 42 U.S.C. § 1983 claim against Brockton related to the same alleged constitutional violations (Count III); a Massachusetts Civil Rights Act claim against both Defendants (Count IV); and battery and intentional infliction of emotional harm claims against both Defendants (Counts V and VI). [Compl. ¶¶ 56–86].

Brockton moved to dismiss the claims against it on July 10, 2023. [ECF No. 11]. On August 13, 2023, Johnson assented to the dismissal of Counts IV, V, and VI, only as they pertained to Brockton, and otherwise opposed Brockton's motion to dismiss Count III. [ECF No. 15].

**II.**      **LEGAL STANDARD**

In reviewing a motion to dismiss under Rule 12(b)(6), the Court must accept as true all well-pleaded facts, analyze those facts in the light most favorable to the plaintiff, and draw all reasonable factual inferences in favor of the plaintiff. See Gilbert v. City of Chicopee, 915 F.3d 74, 80 (1st Cir. 2019). "[D]etailed factual allegations" are not required, but the complaint must set forth "more than labels and conclusions." Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555 (2007). The alleged facts must be sufficient to "state a claim to relief that is plausible on its face." Id. at 570.

"To cross the plausibility threshold a claim does not need to be probable, but it must give rise to more than a mere possibility of liability." Grajales v. P.R. Ports Auth., 682 F.3d 40, 44–45 (1st Cir. 2012) (citing Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009)). "A determination of plausibility is 'a context-specific task that requires the reviewing court to draw on its judicial

experience and common sense.'" Id. at 44 (quoting Iqbal, 556 U.S. at 679). "[T]he complaint should be read as a whole, not parsed piece by piece to determine whether each allegation, in isolation, is plausible." Hernandez-Cuevas v. Taylor, 723 F.3d 91, 103 (1st Cir. 2013) (quoting Ocasio-Hernández v. Fortuño-Burset, 640 F.3d 1, 14 (1st Cir. 2011)). "The plausibility standard invites a two-step pavane." A.G. ex rel. Maddox v. Elsevier, Inc., 732 F.3d 77, 80 (1st Cir. 2013) (citing Grajales, 682 F.3d at 45). First, "the [C]ourt must separate the complaint's factual allegations (which must be accepted as true) from its conclusory legal allegations (which need not be credited)." Id. (quoting Morales-Cruz v. Univ. of P.R., 676 F.3d 220, 224 (1st Cir. 2012)). Second, "the [C]ourt must determine whether the remaining factual content allows a 'reasonable inference that the defendant is liable for the misconduct alleged.'" Id. (quoting Morales-Cruz, 676 F.3d at 224).

### III. DISCUSSION

Brockton argues that Johnson's § 1983 claim (Count III) must be dismissed because Johnson has failed to allege municipal liability consistent with Monell v. Dep't of Social Servs. of N.Y., 436 U.S. 658 (1978). [ECF No. 12 at 4–10]. Under Monell, "a municipality cannot be held liable solely because it employs a tortfeasor—or, in other words, a municipality cannot be held liable under § 1983 on a respondeat superior theory." 436 U.S. at 91 (emphasis omitted). However, "a municipality . . . may be held liable when" a plaintiff's injury is directly caused by either: (1) a municipal policy or (2) a municipal custom. Thomas v. Town of Chelmsford, 267 F. Supp. 3d 279, 305 (D. Mass. 2017) (citing Monell, 436 U.S. at 694).

Johnson urges that the Complaint's allegations "support the reasonable inference . . . that Brockton implements a regulation of arresting children for exercising their 1st Amendment rights . . . and using excessive force when doing so," and that Johnson has therefore adequately alleged

5

a Monell claim. [ECF No. 15 at 4]. Johnson refers to this as a "custom or policy." [Compl. ¶¶ 70–71]. The Court thus evaluates whether Johnson's allegations reasonably support the existence of a municipal policy or custom.

Beginning with municipal policy: "[a] Section 1983 claim based on a theory of municipal policy is only viable where 'the action that is alleged to be unconstitutional implements or executes a policy statement, ordinance, regulation, or decision officially adopted and promulgated by that body's officers.'" Freeman v. Town of Hudson, 849 F. Supp. 2d 138, 149 (D. Mass. 2012) (quoting Monell, 436 U.S. at 690), aff'd, 714 F.3d 29, 38 (1st Cir. 2013). "[A] single decision by [a] person with final policy-making authority may result in municipal liability under certain circumstances. . . . However, this single action 'must be taken by a municipal official with "final policy-making authority" in the relevant area of the city's business.'" Id. (citing Welch v. Ciampa, 542 F.3d 927, 942 (1st Cir. 2008); and then quoting Roma Constr. Co. v. Russo, 96 F.3d 566, 576 (1st Cir. 1996)). The action constituting a municipal policy also "must be . . . the moving force behind the constitutional violation." Bordanaro v. McLeod, 871 F.2d 1151, 1162 (1st Cir. 1989).

The Court finds that Johnson has failed to allege that Brockton has any official policy that caused her alleged constitutional injuries. Other than a conclusory allegation that "[the] violations of law described [in the Complaint] constituted a custom or policy of the City of Brockton," [Compl. ¶ 71], which the Court need not credit, see A.G. ex rel. Maddox v. Elsevier, Inc., 732 F.3d 77, 80 (1st Cir. 2013), there is no allegation that BPD has a policy "officially adopted and promulgated," Monell, 436 U.S. at 690, by decisionmakers with policymaking authority. Rather, Johnson points to the events of October 3, 2019 and BPD's internal review concluding that the officers had followed department regulations on October 3. [ECF No. 15 at

6

4–6]. While a decision by an individual with final policymaking authority can establish municipal policy, here the October 3 incident allegedly involved officers and a supervisor, and the report containing the internal review's conclusion was written by a police sergeant; none whom have final policymaking authority. See Freeman, 714 F.3d at 38 (affirming dismissal of Monell claim based on "'final authority' theory of municipal liability . . . [because] [t]he complaint . . . reference[d] no state or local laws establishing the policymaking authority of any individual or group of individuals . . . [and] allege[d] misconduct from many separate actors, but g[a]ve[] no guidance about which acts are properly attributable to the municipal authority"); Brown v. Revere Police Dep't, No.16-cv-11406, 2017 WL 5197861, at *3 (D. Mass. Jan. 5, 2017) (dismissing a Monell claim related to alleged excessive force used by several officers during a search, finding that "[t]he complaint . . . fails to depict or reasonably infer that [the] [o]fficers . . . held final policymaking authority, . . . 'references no state or local laws establishing the policymaking authority of any individual or group of individuals[,]' . . . [and] does not depict any relevant decision by a legislative body." (citing Freeman, 714 F.3d at 38)), R. & R. adopted, No.16-cv-11406, ECF No. 21 (D. Mass. Jan. 27, 2017).

Likewise, although allegations related to an event itself can sometimes support the reasonable inference of a municipal policy, Bordanaro v. McLeod, 871 F.2d 1151, 1156–57 (1st Cir. 1989) ("[E]vidence of a single event alone cannot establish a municipal custom or policy, [but] where other evidence of the policy has been presented and the 'single incident' in question involves the concerted action of a large contingent of individual municipal employees, the event itself provides some proof of the existence of the underlying policy or custom."), Johnson's allegations related to an officer's conduct on a single day, witnessed by other officers, and the subsequent review of that conduct, without more, "fall[] significantly short of the kind of single

7

event that 'reasonably infers [that] the officers involved were operating under a shared set of rules and customs.'" Brown v. Revere Police Dep't, No.16-cv-11406, 2017 WL 5197861, at *3 (D. Mass. Jan. 5, 2017) (citing Bordanaro, 871 F.2d at 1156); cf. Bordanaro, 871 F.2d at 1156 (finding evidence related to the "joint actions of the entire night watch of the Everett Police Department," supported the existence of a municipal "practice of breaking down doors when apprehending felons," where there was also evidence that the police "sergeant had been present at either 'about 20 or 30' or '50, 60' situations involving door breakdowns over his 24–year tenure as a police officer"; "[a] 12–pound sledge hammer was provided by the City of Everett for use in breaking down doors"; and "[n]umerous occasions in which doors were broken down by Everett officers involved the unconstitutional practice of breaking down doors without a warrant when attempting to arrest a felon"). Thus, the Court finds that Johnson has failed to allege a plausible municipal policy.

Turning to municipal custom: to establish a § 1983 claim based on a municipal custom, the custom "must be attributable to the municipality[,]" Whitfield v. Melendez-Rivera, 431 F.3d 1, 13 (1st Cir. 2005), such that it is "so well settled and widespread that the policymaking officials of the municipality can be said to have either actual or constructive knowledge of it yet did nothing to end the practice," Baez v. Town of Brookline, 44 F.4th 79, 82 (1st Cir. 2022) (quoting Whitfield, 431 F.3d at 13). Evidence of a single incident of a constitutional deprivation "is insufficient, in and of itself, to establish a municipal 'custom or usage' within the meaning of Monell." Mahan v. Plymouth Cnty. House of Corrs., 64 F.3d 14, 16–17 (1st Cir. 1995) (emphasis omitted). Allegations of "multiple instances of misconduct" that suggest a "systemic pattern of activity," however, may support an inference of a municipal custom. See Doe v. Town of Wayland, 179 F. Supp. 3d 155, 173 (D. Mass 2016) (first citing Kibbe v. City of Springfield,

777 F.2d 801, 806 (1st Cir. 1985); and then citing <u>Baron v. Suffolk Cnty. Sheriff's Dep't</u>, 402 F.3d 225, 238–39 (1st Cir. 2005) (abrogated on other grounds)). As with a municipal policy, "the custom must have been the cause of and 'the moving force behind' the constitutional violation." <u>Id.</u> at 172 (quoting <u>Bordanaro</u>, 871 F.2d at 1156).

The Court finds that the Complaint's allegations fail to establish that the alleged de facto regulation is "so well settled and widespread," <u>Baez</u>, 44 F.4th at 82 (quoting <u>Whitfield</u>, 431 F.3d at 13), as to be attributable to Brockton. In <u>Barker v. City of Boston</u>, in which plaintiffs alleged that the Boston Police Department had a "de facto policy condoning the use of excessive force," another session of this court found that allegations of the Department's failure to discipline several officers involved in a fatal shooting, and the corresponding "insufficiency of the investigation of [the victim's] shooting," failed to show the existence of a custom, even when accompanied by allegations of previous incidents of use of lethal force. 795 F. Supp. 2d 117, 124–25 (D. Mass. 2011). The court found that the complaint failed to make out a plausible custom because the complaint lacked "allegations of [other] incidents in which Boston police officers used excessive force but were not disciplined or other concrete, non-conclusory allegations" that would show "a persistent[] fail[ure] to discipline officers who used excessive force[,]" <u>id.</u>; <u>cf.</u> <u>Huffman v. City of Boston</u>, No. 21-cv-10986, 2022 WL 2308937, at *7 (D. Mass. June 27, 2022) (finding that allegations of numerous instances of excessive force used by officers over several days against protest and protest-march participants, the police department's failure to investigate those instances, and past confirmed instances of the police department's failure to investigate or discipline were "just barely" sufficient to establish a municipal custom of failing to supervise, investigate, or discipline officers' use of force in this context).

Here, although there are allegations pertaining to an officer's conduct related to multiple arrests on a single day, witnessed by multiple officers, and a subsequent review of the officers' conduct, there are no allegations of other instances of similar conduct or failures to discipline similar conduct.  The Court finds Johnson's allegations do not demonstrate that the use of excessive force by officers during the arrests of juveniles for exercising their First Amendment rights is "so well settled and widespread that the policymaking officials of the municipality can be said to have either actual or constructive knowledge of it yet did nothing to end the practice," Baez, 44 F.4th at 82, and therefore such conduct is not "attributable to the municipality," Whitfield, 431 F.3d at 13.  Thus, the Court finds that Johnson has also failed to adequately allege a municipal custom.

IV.   CONCLUSION

Accordingly, for the reasons set forth above, Brockton's motion to dismiss, [ECF No. 11], is GRANTED without prejudice.

**SO ORDERED.**

January 16, 2024                                      /s/ Allison D. Burroughs
                                                      ALLISON D. BURROUGHS
                                                      U.S. DISTRICT JUDGE

10